The next case on the calendar is Stone Partners LLC v. Monster Worldwide, Inc. Excuse me. Do you have a paper towel? Somebody's left me a puddle. If you have a paper towel anywhere, I'll take care of it. If you don't have them here, I'll go get some out back. Troy, you need some? Thank you very much, sir. May it please the Court. At pages 10 and 38 of its brief, Monster concedes that the termination and tail fee provision of the engagement letter set out in Section 6 is, quote, by termination upon written notice, not by completion. If Stone Key's engagement could be completed without a sale transaction and without written notice of termination, there would be no reason why Monster would ever give written notice to start a tail fee that would never begin running. The tail fee provision would be superfluous. In order to avoid that, the District Court rewrote the contract holding that the tail fee provision was triggered by completion, not termination on written notice, which had never been provided. There is no justification to affirm that holding, rewriting the contract. This was an M&A engagement. Stone Key was not being paid for a review. Stone Key was being paid to advise on the sale of the company or partial sales of material parts of the company and to assist Monster as requested. Payment to Stone Key was triggered only by transactions. Unlike the general advisory engagement letter, which the same parties executed on the same day, April 20, 2012, which had a calendar end date upon which it was completed, the engagement letter at issue on this appeal had no end date, but as is standard in the investment banking industry, was terminable at will, at any time, for no reason at all, upon written notice. An email would have sufficed. Only upon written notice. Only, only upon written notice. Did materiality kick into this? Materiality kicks into this in the sense of partial sale transactions. They were material, and the District Court erred. Judge Livingston, you were on the federal housing panel against Nomura. This Court has said time and time again that it is not appropriate for the District Courts to apply simply a quantitative measure for materiality. You must give a fulsome analysis to qualitative measures as well. The District Court here did not do that at all. The District Court, in terms of assets, also hung its hat on book value, a term which does not appear anywhere in the contract and which this Court has time and time again said, quote, book value is not ordinarily an accurate reflection of the market value of an asset, end quote. With respect, I'm sorry, on materiality, back on materiality or continuing of materiality, is there anything anywhere that helps us determine what is material in the context of this agreement? Yes. The contract defines partial sale transaction as a sale of a material portion of the assets or operations. And where do I find, when I'm looking at this, what is a material portion of the asset? Well, when the transaction is publicly announced and the stock pops up 16%, that's an indication of materiality. Where the job career is 36% of Monster's total net income, that's material. Where it is referred to by Monster as its, quote, crown jewel, that's material. Where it's over 27% of the reported operating income, that's material. We marshal all of this in our brief at pages 34 to 38. We're talking about, or at least I'm thinking about, the latter portion that sort of falls within the tail. Isn't there a, that Judge Furman said was only 3.7% of the value? Oh, what Judge Furman did was he took book value, then he divided it, the transaction here, as if it were an asset sale. And it's not. It's a stock sale. H&Q bought 49.99% of the assets of Job Korea. Monster retained 50.01%. That was simply an accounting convention so they could consolidate on their financials. In terms of control, they both were partners, they both had control, and Monster couldn't operate the business without the express consent of H&Q. And we go through that at length in the brief. In terms of the materiality, it's, keep your eye on the P. The judge divided the price in half, as if it were an asset sale, and it's not. And he took half the price and divided that by the book value of the assets on the balance sheet and came up with 3.7. If you take the full amount, because it's a stock sale, not an asset sale, you get 7.3. But the bottom line, Your Honor, is that under every metric you look at, this was a material transaction. Is this a factual determination, so you're arguing that the judge clearly erred in his assessment of materiality? No, this court has said, well, materiality is a mixed question of law and fact. This court has, on a number of times, ruled on materiality as a matter of law. In the RBS case, in the ECA case, there are, I can give you five cases where this court has held as a matter of law something is or is not material. But what do we look to, to inform us in the context of this case, what is material? I mean, you gave me a list of things. Why that? Well, because those are the— Why do we care? Those are the normal metrics that courts look at for financial materiality. How about this one? As who? What case tells us that those are the metrics we look at? The cases that we cite, Your Honor, the financial securities cases. Most parties before the district court relied on securities cases, right? Right. And so I guess both parties agreed that those were the relevant cases for defining materiality for the purposes of this contract. I believe that's true. And there is one other point, Your Honor. Monster commissioned and paid for a fairness opinion on job career one. You don't get fairness opinions except for material transactions. The fee—let me skip to the last point. The fee is not an agreement to agree and unenforceable. The contract—when you have a partial sale, when you're engaged, you don't know what part of the company you're going to sell. And you don't know what the terms are going to be. So the engagement letter says, Monster will pay Stone Key, and it's with reference to customary fees awarded to employees. In like transactions, in two-advisor situations, they refer exactly to objective criteria known in the trade. Now, Your Honor, Judge Hall, in the Olin v. One Beacon case, you said a contract is not ambiguous—or, excuse me, it is ambiguous only. It's ambiguous only. If it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminologies generally understood in the particular trade or business. At pages 10 and 38 of their brief, they admit this is a standard industry engagement, the terms that are at issue. No one cognizant of the customs and practices would find an ambiguity in this termination provision, and no one would wrench the word completion out of the last sentence of an attached indemnification provision, which is intended to make crystal clear that indemnification obligations survive everything. They survive termination, modification, completion. No one would wrench that word out of that other document and use it to rewrite a crystal clear and unambiguous termination provision. It may be terminated, quote, upon written notice. The cases are legion that upon written notice is a term pervasively used in engagement letters in the investment banking industry. Judge Chin, when he was a district judge in the Oneida case, dealt with this express language in an investment banking engagement letter and said that the only way it could be terminated, it was mandatory upon written notice, permissive to terminate any time it will, mandatory it had to be upon written notice. There is no dispute about that. What this district judge did, and Judge Kelly in certain underwriters of Lloyds against convergence, Your Honor said, if the agreement on its face is reasonably susceptible of only one meaning, the court is not free to alter the contract to reflect its personal notions of fairness and equity. That is exactly what the district court in this case did. Mr. Gill, can I ask you whether there's any argument that the fact that this was a limited purpose engagement, does that create any ambiguity that perhaps that once the purpose is no longer being pursued? Absolutely not, because the engagement letter does not provide for termination when I say it's over. M&A agreements are in fits and starts, ebbs and flows. There are periods of pencils down. There are periods of quietude. That does not mean termination, nor does it mean completion. We're not talking about football completion of a forward pass. We're talking about a contract. Mr. Rebuttal, do you want to use some of that now? No, I'd prefer. Thank you, sir. Good morning. May it please the Court, my name is Ryan Walsh. I'm here on behalf of the defendant, Appleby Monster Worldwide. I think my first point, Your Honors, is that we don't disagree that that termination provision is standard in some contracts. The problem is it doesn't say what they say it says, and frankly, that's why he didn't read it to you. There's great irony in the fact that they've had two briefs and now they've filed two 28-J letters, emphasizing that we're trying to rewrite the contract when it's Stonekey that is clearly trying to rewrite the termination provision. More specifically, Stonekey wants this Court to rewrite it to say that the engagement letter will continue until written termination or sale transaction. It does not say that. Frankly, Your Honors, they can't point to a single word in this engagement letter, and at trial they did not, that suggests that completion only means sale transaction. At trial they said, they claimed that it was inherent in the idea of the contract. Now, there's a good reason for that. Again, instead, if you look at the language of the engagement letter, it clearly references completion of the engagement, and it is undisputed, despite some arguments in their briefs, it is undisputed that that engagement, the scope of it, is defined in Section 1. In Section 1, it says that it's to act as the financial advisor in connection with Monster's review of strategic alternatives. The scope of the engagement is not the transaction. The transactions are triggers for fees under the contract. Now, and I think it's very important to recognize that at trial, Stonekey's counsel conceded that this engagement letter can be completed without a sale and without written notice. That is a binding concession. As Judge Furman noted, that effectively ends the argument on completion. At that point, it's just a question of where do we draw the line. And in this case, Your Honors, that line is easily drawn. The line is easily drawn because Stonekey knows that the overwhelming evidence, both in the engagement letter and outside the engagement letter, obliterates their case. Everyone, I just explained to you how the scope of the engagement is tied to completion. But in addition, everyone on all sides of this agreement, Monster, Stonekey, Bank of America, all sides agreed that this review, on what the review was, that it could end without a sale transaction, and that it did, in fact, end without a sale transaction. And Judge Furman's conclusions regarding this evidence is entitled to great deference. And that's why, Your Honors, that Stonekey is so desperate to keep you from considering it. But I think it also bears mentioning here that Stonekey bears the burden. Your Honor, your question about materiality, it's their burden to show that Job Career I was material. That's their burden, and after a three-day trial and the consideration of volumes of evidence and testimony, Judge Furman found that Job Career I was not. And to your point, Your Honor, we agree that that question of materiality is a mixed question of law and fact. But those factual determinations that underlie that determination, they're entitled to deference. And I think with respect to materiality— But Mr. Gilman recites a number of factors that should be or should have been considered when determining materiality. Well, the problem with that, Your Honor, as you pointed out, those aren't in the agreement. The agreement references operations or assets. And Professor Stoll, an expert witness, testified that when, from an investment banker's perspective, when looking at that language in the contract, that assets are determined on a book value. They talk about fair market value and net income. Those terms aren't found in the agreement, Your Honor. What is found in the agreement is aggregate consideration. That's fair market value. That term is used for a sale transaction. It's not found in the partial sale transaction. If the parties wanted to consider fair market value, aggregate consideration, they would have put it in the engagement letter. They didn't. And that's strong evidence that it's not material. I also, just in finishing up on completion, a couple of points. One, we do believe that the language in the engagement letter leads to our conclusion, which is that completion of the engagement meant completion of the review of strategic alternatives. We don't disagree necessarily with the judge's finding, Judge Furman's finding, that completion is ambiguous. It's not defined in the agreement. And that would allow you to get to the extrinsic evidence. It has nothing to do with the termination provision. The cases that they cite, that we cite are clear. The termination provision has nothing to do with when an engagement is completed. And third, Your Honor, even if you were to find that completion is not ambiguous, completion refers to the review of strategic alternatives. And the review of strategic alternatives, to the extent that's not clear from the contract, again, Judge Furman can consider extrinsic evidence. And the last point, Your Honor, and this gets to the Oneida case, particularly Oneida 1. In the Oneida case, the court was very clear in Oneida 1 there is no ambiguity. Yet the court still considered the acts of the parties, the conduct of the parties, to determine whether or not the engagement had been completed. Now, that's important for two reasons. One is obviously the fact that the court is allowed to look outside of the contract to determine when it's completed. It's not necessarily an ambiguity. It's just as if the contract referred to some other external event, that if it occurs, the contract is completed or ends. We're in agreement that the Oneida cases are not binding on us, right? That's correct, Your Honor. Persuasive authority. Persuasive authority, yes, Your Honor. But the other point on that, Your Honor, though, is if they're right and completion has to mean sale transaction, despite the fact that that's not found anywhere in the agreement and they can't point to a single word in the agreement, but if that were the case, why was the Oneida court even considering the conduct of the parties? It was. It was considering them because it was trying to determine what completion meant in the context of this type of engagement letter. In addition, Your Honor, as Judge Herman correctly noted, the Oneida case also involved, the letter, the engagement letter in Oneida, also contemplated a sale transaction. However, in Oneida, the court determined there was completion with just a restructuring transaction. So, again, we think that the Oneida case is strong evidence in support of our case. I do want to, I know I have a little time remaining. The last point I was going to make regarding materiality, Your Honor, there is one screaming beacon that demonstrates that Job Korea One is not material, and it's Stonekey. Stonekey's conduct at the time of that transaction, Monster's conduct, Monster did not hide this transaction from Stonekey. They affirmatively reported it to Stonekey. Stonekey knew all about the transaction. They knew the financial terms. They knew the parties. They knew all about it. They never said a word. Until how long? What was the time period? Your Honor, it was over three years, and not only was it over three years, Your Honor, there is not a single internal document at Stonekey that suggests they thought this was a partial sale transaction, that they thought this was material. Not just that, they were in the depths of a liquidity crisis. The company was in desperate need of revenue. It was falling apart. Yet there's not even a fee run done internally. Nobody said, you know what, that may be a partial sale transaction. That's strong evidence that it's not material and that the engagement was over. That was all before Judge Furman? That's correct, Your Honor. That was all before Judge Furman. And the last point I'm going to make, Your Honor, they sent four demand letters after the Ronstadt transaction. Four. Stonekey, Job Korea, not mentioned until the fourth letter. Not mentioned at all in their first three demand letters. Finally, Your Honor, I know I have a very little bit of time left. I wanted to mention on the enforceability point a couple of points. One, Your Honor, there is no question, the testimony is clear, that the language that's in a partial sale transaction, it requires additional negotiation by the parties. It says it's got to be mutually acceptable. And it talks about some other things, but the only thing that Stonekey pins their hopes on to make this enforceable is the fact that it's standard practice when investment banks are negotiating fee arrangements to do a fee run. But, Your Honor, the problem with that is, as Mr. Ruffer for Stonekey admitted at trial, or at least in his testimony, that yields a wide range of fees. Once you get within that wide range, there still has to be some negotiation. Schumacher, Cobble Hill, both Court of Appeals decisions in the State of New York, both hold that if there is a contract in which a material term is left for future negotiations, it is unenforceable. This is a question we reach only if we disagree with you that the Job Korea One transaction was not material. That is correct, Your Honor. That is correct. And again, Your Honor, the Cobble Hill makes the same point. I think, Your Honor, if there are no other questions of Your Honors, I will take a seat. Thank you, Mr. Wilson. Thank you for the opportunity to be heard. Mr. Gilman, you have two minutes for rebuttal. Counsel referred to a supposed concession in the trial court. There was no concession by Stonekey's counsel that is referenced here. If you look at pages 765 to 767 of the appendix, what counsel, in fact, said is that the completion of a contract means the discharge of duties on both sides, the fulfillment of all obligations. Second, counsel cited to there being no inequity here. The New York Court of Appeals, and this case is governed by New York law, in Chemical Bank against Sepler, cited in our papers with reference to a similar termination provision and five years of inactivity in the contract, said at all times the company had the power to extinguish any perceived inequity. It could simply have served a written termination notice. Its failure to do so cannot give rise to an equitable claim. That's controlling law from the New York Court of Appeals on this case. With respect to materiality, counsel agreed in his brief to this court that the question of materiality is reviewed de novo, page 50 of his brief. That is, in fact, the law. With respect to section 6 of the contract, which is the termination provision, we're not running away from it. We've quoted it, and we've quoted it in every paper we've filed. This termination provision is the industry standard way to end an engagement for any or no reason at all at any time. They did not avail themselves of that. The engagement was live. They then proceeded to close transactions which are, in fact, material, which are, in fact, covered by the engagement, and which do, in fact, then obligate the payment of fees. There is no doubt about that. They could have sent an email. They didn't. This case is very much in that regard like the ADC case, the Peter J. Solomon against ADC Products. There was a two-and-a-half-year period of inactivity with no termination of the engagement. The client went off with another bank and did the deal. The court awarded fees to the original banker, my client in position, and said that the investment bank may be paid for a transaction that it never worked on. There's no reason for the court to ignore the plain terms of the agreement, which were negotiated by two sophisticated parties. That is the law. That is the law that has been upheld time and time again in engagement letters in this industry. If they wanted to terminate the obligation, they could send an email. They never did. And so you would today say, in response to Judge Furman, the portion of Judge Furman's opinion where he says, well, what if the transaction occurred 30 years after the date of the original contract? Well, it might be a singular event, but there was no termination. I would say that this court is bound by the New York Court of Appeals decision in Chemical Bank v. Sepler, 16 New York 2nd, 249. And that case deals with a similar termination provision, deals with five years of inactivity, and the prolonged passage of time, the prolonged inactivity, was argued to lead to absurd, inequitable results. And the court said, the New York Court of Appeals, controlling on this case, at all times, the company, here Monster, had the power to extinguish any perceived inequity. It could simply have served a written termination notice. Its failure to do so cannot give rise to an equitable claim, end quote. I submit this court is bound by the New York Court of Appeals statement. And that it is controlling on the resolution of this appeal. Thank you. Thank you, Mr. Gilman. Thank you, Mr. Walsh. We'll reserve decision on this case.